## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | |
|---|---|
| **PATRICK DUNN,** | **CIVIL ACTION NO.** |
| **Plaintiff,** | |
| **v.** | |
| **PINEY WOODS INVESTMENTS, L.L.C,** | 1:18-cv-269-LG-RHW |
| **MCCLAIN SONICS, INC., and SONIC** | |
| **CORP.,** | |
| **Defendants.** | |

## COMPLAINT

## I.      INTRODUCTION

Plaintiff, Patrick Dunn, files this Title III, ADA action, pursuant to 42 U.S.C. §12181, et. seq. In Count One of the Complaint, Plaintiff seeks to enjoin the Defendants to remove architectural barriers. In Count Two, Plaintiff seeks to enjoin Defendants to maintain practices, policies, and procedures necessary to maintain the premises free of architectural barriers both now and once the barriers are removed. In Count Three, Plaintiff seeks to enjoin the Defendants' use of the premises to provide full and equal enjoyment of the SONIC environment to individuals with disabilities. Counts Two and Three seek independent relief in addition to the removal of architectural barriers. Count Four seeks to enjoin Defendants' failure to design and construct the establishment to be readily accessible to and usable by individuals with disabilities. Count Five seeks to enjoin Defendants to make their website accessible to the Plaintiff so that he is provided the full and equal services of the website. In Count Six, Plaintiff seeks to enjoin Defendants' failure to take the necessary steps to ensure Plaintiff is not denied services, segregated or otherwise treated differently than other individuals who do not have disabilities through the use of the mobile

software applications.

## JURISDICTION, PARTIES, AND ARTICLE III STANDING

1.      Because this is an action for declaratory and injunctive relief pursuant to Title III of the Americans with Disabilities Act, 42 U.S.C. §12181, et. seq., (hereinafter referred to as the "ADA") and its implementing regulations, this Court is vested with original jurisdiction under 28 U.S.C. §1331 and §1343.

2.      Venue is proper in this Court, the United States District Court for the Southern District of Mississippi, pursuant to Title 28, U.S.C. §1391 and the Local Rules of the United States District Court for the Southern District of Mississippi.

3.      Plaintiff, Patrick Dunn, resides in Andalusia, Alabama. On March 8, 2001, Mr. Dunn was injured in an automobile accident that caused permanent damage to his C-7 vertebra in his spinal cord. As a result, he became paralyzed and uses a wheelchair for mobility and experiences restricted ability to use his hands, arms, and legs. Mr. Dunn is, accordingly, a person with a disability pursuant to the Americans with Disabilities Act, in that he has a physical impairment substantially limiting one or more major life activities.  42 U.S.C. § 12102; See also 28 C.F.R. § 36.104.

4.      Defendant, Piney Woods Investments, L.L.C. (hereinafter "Piney"), is a limited liability company that is both registered to conduct business and is conducting business within the State of Mississippi sufficient to create both general and specific in personam jurisdiction. Upon information and belief from the property records on the Harrison County Geographical Information System, Piney Woods Investments, L.L.C. "owns" the real property and improvements located at 15025 Creosote Rd, Gulfport, MS 39503. 42 U.S.C. § 12182. The SONIC

QSR is a place of public accommodation pursuant to 42 U.S.C. § 12181(7).

     5.     Defendant, McClain Sonics, Inc. (hereinafter "McClain"), is a corporation that is both registered to conduct business and is conducting business within the State of Mississippi sufficient to create both general and specific in personam jurisdiction. Upon information and belief from the property records on the Harrison County Geographical Information System, McClain Sonics, Inc., "operates" the SONIC quick service restaurant located at 15025 Creosote Rd, Gulfport, MS 39503. 42 U.S.C. § 12182. The SONIC QSR is a place of public accommodation pursuant to 42 U.S.C. § 12181(7).

     6.     Defendant, SONIC Corp., (hereinafter, "SONIC Corp."), is a corporation that is conducting business within the State of Mississippi sufficient to create both general and specific *in personam* jurisdiction. Upon information and belief, SONIC Corp., "owns" the public internet website www.sonicdrivein.com and the SONIC mobile application and its goods and services offered on the mobile app, and "operates" the world-wide website services and mobile application services that are available to the public at SONIC. It is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices, and procedures, and further, providing auxiliary aids and services to its web-based services and mobile application services. 42 U.S.C. § 12182.

     7.     All events giving rise to this lawsuit occurred in the Southern District of Mississippi and the Defendants are citizens thereof.

     8.     Plaintiff Patrick Dunn enjoys vacationing in the Mississippi Gulf Coast area because he enjoys the different types of entertainment, nightlife, and food variety that the Gulf Coast offers. Plaintiff has recently visited the Sonic restaurant, specifically and enjoys the made-

to-order American classics, signature menu items, speedy service from friendly Carhops and heaping helpings of fun and personality offered at Sonic quick service restaurants. He intends to continue going to Sonic because he enjoys the freshly prepared food and Carhop delivery. Plaintiff will return not only to dine at the Sonic QSR, but also to confirm compliance with the ADA by the Defendants. Plaintiff cannot provide a specific time and date upon which he will return to the restaurant because he has not and should not be expected to engage in such definite future planning. Plaintiff, like other fast food customers, often patronizes a fast food establishment on the spur of the moment. Nevertheless, Plaintiff definitely intends to return to the restaurant.

9.      Because of the barriers described below in paragraph 22 and throughout the Complaint, Plaintiff has been denied full and equal enjoyment of the Defendants' premises on the basis of his disabilities.

10.      Plaintiff accordingly, has Article III standing to pursue this case because (1) he is a person with a disability, , pursuant to the statutory and regulatory definition; (2) the Defendants' restaurant is a place of public accommodation, pursuant to the statutory and regulatory definition; (3) he has suffered a concrete and particularized injury, by being denied access to SONIC by architectural barriers, by being denied access by the Defendants' practices described throughout this Complaint, and by Defendants' denial of the use of SONIC for his full and equal enjoyment as the able-bodied, as described throughout the Complaint, and (4) because of these injuries, there exists a genuine threat of imminent future injury, as described in paragraph 20.

## II.     PLAINTIFF'S CLAIMS

**ADA, Title III**

11.     On or about July 26, 1990, Congress enacted Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12181 et.seq. Commercial enterprises were provided one and a half years from enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992. (42 U.S.C. §12181; 20 C.F.R. §36.508 (A); *See also*, § 36.304).

12.     Pursuant to 42 U.S.C. § 12181(7) and 28 C.F.R. § 36.104, the Defendants' establishment is a place of public accommodation in that it is a quick service restaurant providing food and drink to the public. Accordingly, it is covered by the ADA and must comply with the Act.

### COUNT ONE
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III
### 42 U.S.C. § 12182(b)(2)(A)(iv)
### *(Architectural Barriers)*

**Defendants' Existing Facility Is Subject to the 2010 ADA Design Standards for the Portions of the Facility Addressed in This Complaint**

13.     Plaintiff is informed and believes based on publicly available information that the building in which SONIC is located at 15025 Creosote Rd., Gulfport, MS 39503 was first constructed in 1999.

14.     Plaintiff is further informed and believes based on publicly available information that the SONIC quick service restaurant located at 15025 Creosote Rd., Gulfport, MS 39503 underwent alterations and/or improvements in or around 2005 with subsequent improvements thereafter.

15.     The ADA was enacted requiring that facilities constructed prior to January 26, 1992, are considered an "existing" "facility, such that those facilities must remove architectural barriers where such removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv). All "alterations" made to existing facilities after January 26, 1992, and all "new construction" after January 26, 1993, must be *readily accessible to and usable by individuals with disabilities*, including *individuals who use wheelchairs*. 42 U.S.C. § 12183(a) and (b). 28 *C.F.R.* § 36.402. "Readily accessible to and usable by. . ." is the "new construction" standard, which requires compliance with the Department of Justice standards. 42 U.S.C. § 12183(a)(1); 28 *C.F.R.* § 36.406. The only defense for failing to provide readily accessible and usable buildings constructed under the "new construction" standards is if the design and construction of the building to be readily accessible and usable is "structurally impracticable". 42 U.S.C. § 12183(a)(1). The "structural impracticability" defense applies only in rare circumstances of extraordinary terrain. 28 *C.F.R.* § 36.401(c). "Readily accessible to and usable by. . ." is also the "alterations" standard. 42 U.S.C. § 12183(a)(2). "Alterations" must be made to the maximum extent feasible. 42 U.S.C. § 12183(a)(2); 28 *C.F.R.* § 36.402. An alteration is a change to a place of public accommodation or commercial facility that affects or could affect the usability of the facility or any part thereof. 28 *C.F.R.* § 36.402(b).

16.     New construction and alterations must comply with either the Justice Department's 1991 Standards for Accessible Design, or the 2010 Standards for Accessible Design. 28 *C.F.R.* § 36.406 establishes whether the 1991 Standards for Accessible Design or 2010 Standards for Accessible Design apply: New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 1991 Standards if the date when the last application for a building permit or permit

extension is certified to be complete by a State, county, or local government is before September 15, 2010, or if no permit is required, if the start of physical construction or alterations occurs before September 15, 2010. 28 *C.F.R.* § 36.406(a)(1). New construction and alterations subject to §§ 36.401 or 36.402 shall comply either with the 1991 Standards or with the 2010 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is on or after September 15, 2010, and before March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after September 15, 2010, and before March 15, 2012. 28 *C.F.R.* § 36.406(a)(2). New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 2010 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is on or after March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after March 15, 2012. *Where the facility does not comply with the 1991 Standards, the 2010 Standards are applicable*. See 28 C.F.R. § 36.406(5)(ii) which states, "Newly constructed or altered facilities or elements covered by §§ 36.401 or 36.402 that were constructed or altered before March 15, 2012 and that do not comply with the 1991 Standards shall, on or after March 15, 2012, be made accessible in accordance with the 2010 Standards."

17.     For the architectural barriers at issue in this case, the 2010 Standards for Accessible Design are applicable.

### Plaintiff's Concrete and Particularized Standing to Pursue an Injunction

18.     The Defendants have discriminated, and continue to discriminate, against Plaintiff, and others who are similarly situated, by denying full and equal access to, and full and equal

enjoyment of goods, services, facilities, privileges, advantages and/or accommodations at SONIC in derogation of 42 U.S.C. § 12101 et. seq., and as prohibited by 42 U.S.C. § 12182 et-seq. As "new construction", the building must be readily accessible to and usable by individuals with disabilities. 42 U.S.C. § 12183 (a) and (b).  Defendants' failure to remove the existing barriers thus violates 42 U.S.C. § 12182(b)(2)(A)(iv), which requires removal of architectural barriers.

19.     Prior to the filing of this lawsuit, Plaintiff was denied full and safe access to all of the benefits, accommodations and services offered to individuals without disabilities within and about the Defendants' establishment. Plaintiff's access was inhibited by each of the described architectural barriers detailed in this Complaint which remain at the establishment in violation of the ADA. Because of the foregoing, Plaintiff has suffered an injury-in-fact in precisely the manner and form that the ADA was enacted to guard against.

20.     Plaintiff has definite plans to return to SONIC in the future, as described in paragraph 8. Plaintiff will return to SONIC in both Fall 2018 and Spring 2019 both to eat and enjoy the made-to-order American classics, signature menu items, speedy service from friendly Carhops and heaping helpings of fun and personality, and to see if SONIC has repaired the barriers, and changed its practices and procedures. Plaintiff will continue to do so even when SONIC is repaired, because SONIC is an enjoyable place, after all. Mr. Dunn certainly would not want to stop going when SONIC is repaired and its practices are modified; that is all the more reason to go. Also, and of vital importance, the barriers are not just created by construction issues; instead, many of them are created by human activity, from the way the Defendants' workers at the establishment use the physical architectural elements of the facility. The barriers created by human activity will need to be reviewed and maintained forever, to be sure Defendants' management and workers

continuously act in a manner that does not create barriers. Absent remedial action by Defendants, Plaintiff will continue to encounter the architectural barriers, and the discriminatory policies, practices, and procedures described herein and as a result, be discriminated against by Defendants on the basis of his disabilities. The Eleventh Circuit held in <u>*Houston v. Marod Supermarkets*</u>, 733 F.3d 1323 (11th Cir. 2013), when architectural barriers have not been remedied "*there is a 100% likelihood that plaintiff … will suffer the alleged injury again when plaintiff returns to the store*." Due to the definiteness of Plaintiff's future plans to continue visiting the subject establishment, there exists a genuine threat of imminent future injury.

**<u>Architectural Barriers</u>**

21.     Pursuant to the mandates of 42 U.S.C. § 12134(a), on July 26, 1991, the Department of Justice, Office of the Attorney General, promulgated Federal Regulations to implement the requirements of the ADA. 28 C.F.R. Part 36.

22.     Plaintiff has been from the parking area to the restrooms; the restrooms themselves; from the restrooms to the dining area; throughout circulation paths and accessible routes, paths of travel, and in particular but not limited to all of which is more specifically described below. Moreover, Defendants' facility located at 15025 Creosote Rd., Gulfport, MS 39503, violates the ADA in the parking area, dining area, restroom, and in particular but not limited to:

    **A.** Defendants provide a parking area with parking spaces that have routes connecting the parking spaces to the entrance of the establishment for able-bodied individuals, but fails to provide that same level of access by providing an ADA accessible route from the accessible parking spaces to the accessible entrance for non-able-bodied individuals which segregates and relegates individuals with disabilities to inferior benefits of the

goods and services provided at Defendants' place of public accommodation which includes but is not limited to the following failures of Defendants:

**(1)** Defendants fail to maintain the parking area and its associated accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by individuals with disabilities which includes but is not limited to parking spaces failing to be located on the accessible route to the entrance which has the discriminatory effects of rendering the parking spaces and its associated elements as unusable by individuals with disabilities;

**(2)** The parking area fails to maintain the required number of parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the level parking spaces measure 96 inches wide minimum with adjoining compliant access aisles that measure 60 inches wide minimum and connect to an accessible route to the entrance of the establishment;

**(3)** The parking area fails to maintain the required number of parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces and adjacent access aisles extend the full length of the parking space and is marked so as to discourage parking in the access aisle which renders it unusable by customers with disabilities;

**(4)** The parking area fails to maintain the required number of parking spaces, including its adjoining access aisle, in operable condition by conforming

with the ADA Standards for Accessible Design so that the parking spaces are identified with signage including the international symbol of accessibility that is mounted 60 inches minimum above the finished floor or ground surface measured to the bottom of the sign;

**(5)** The parking area fails to maintain the required number of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces and its adjacent access aisles are designed or otherwise maintained in a way so that when cars and vans, when parked, cannot obstruct the required clear width of adjacent accessible routes and render the parking space as unusable by individuals with disabilities;

**B.** Defendants provide a parking area with parking spaces that have routes connecting the parking spaces to the entrance of the establishment for able-bodied individuals, but fails to provide that same level of access by providing an ADA accessible route from the accessible van parking spaces   to the accessible entrance for non-able-bodied individuals which segregates and relegates individuals with disabilities to inferior benefits of the goods and services provided at Defendants' place of public accommodation which includes but is not limited to the following failures of Defendants:

**(1)** Defendants fail to maintain the parking area and its associated accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to van parking spaces failing

to be located on the accessible route to the entrance which has the discriminatory effects of rendering the parking spaces and its associated elements as unusable by individuals with disabilities;

**(2)** The parking area fails to maintain the required number of accessible van accessible parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the van parking space measures 132 inches wide minimum with an adjoining compliant access aisle that measures 60 inches wide minimum, or alternatively a 96 inch wide space with an adjoining 96 inch wide access aisle, and connects to an adjoining accessible route to the entrance of the establishment;

**(3)** The parking area fails to maintain the required number of accessible van parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the van parking space's adjacent access aisle extends the full length of the parking space and is marked so as to discourage parking in the access aisle which renders it unusable by individuals with disabilities;

**(4)** The parking area fails to maintain the required number of accessible van parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces are identified with signage including the international symbol of accessibility that is mounted 60 inches minimum above the finished floor or ground surface measured to the bottom of the sign;

      **(5)** The parking area fails to maintain the required number of accessible van parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces and its adjacent access aisles are designed or otherwise maintained in a way so that when cars and vans, when parked, cannot obstruct the required clear width of adjacent accessible routes and render the parking space as unusable by individuals with disabilities;

**C.** Defendants provide a parking area with parking spaces that have routes connecting the parking spaces to the entrance of the establishment for able-bodied individuals, but fails to provide that same level of access by providing an ADA accessible route from the accessible parking spaces  to the accessible entrance for non-able-bodied individuals which segregates and relegates individuals with disabilities to inferior benefits of the goods and services provided at Defendants' place of public accommodation which includes but is not limited to the following failures of Defendants:

      **(1)** Defendants fail to maintain the parking area and its associated accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to providing all of the necessary components on the ADA accessible route to the entrance including without limitation ramps, walking surfaces, and other associated elements which has the discriminatory effects of rendering the parking spaces and its associated elements as unusable by individuals with disabilities.

**(2)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design so that the adjacent surfaces at transitions at curb ramps to walks, gutters, and streets are at the same level;

**(3)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design so that the running slope is not steeper than 1:12.

**(4)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design so that the cross slope is not steeper than 1:48.

**(5)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design so that there are no changes in level other than the running slope and cross slope.

**(6)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design in all the ways that are required to be usable by people with disabilities which includes but is not limited to providing a ramp that is 36 inches wide minimum with a level landing at the top and bottom of the ramp measuring 60 inches long minimum and at least as wide as the ramp;

**(7)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for

Accessible Design so that the curb ramp does not project into vehicular traffic lanes, parking spaces, or parking access aisles;

**D.** Defendants provide dining surfaces disbursed throughout the establishment for the consumption of food or drink at the outdoor dining area for able-bodied individuals, but fails to maintain that same level of service to individuals with disabilities, which segregates and relegates individuals with disabilities to inferior benefits of the goods and services provided at Defendants' place of public accommodation which includes but is not limited to the following failures of Defendants:

**(1)** There is not at least 5% of the seating spaces and standing spaces at the outdoor dining surfaces that are maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by individuals with disabilities which includes but is not limited to the accessible route to the dining surfaces which has the discriminatory effects of rendering the outdoor seating spaces and associated elements as unusable by individuals with disabilities;

**(2)** There is not at least 5% of the seating spaces and standing spaces at the outdoor dining surfaces that are maintained in operable condition with the ADA Standards for Accessible Design so that the seating spaces maintain the required t-shaped and/or circular turning clear floor space;

**(3)** There is not at least 5% of the seating spaces and standing spaces at the outdoor dining surfaces that are maintained in operable condition with the ADA Standards for Accessible Design so that the seating spaces maintain

the required 30x48 inches of clear floor space that is positioned for a forward approach to the dining surface;

**(4)** There is not at least 5% of the seating spaces and standing spaces at the outdoor dining surfaces that are maintained in operable condition with the ADA Standards for Accessible Design so that the tops of the dining surfaces measure 28 inches minimum and 34 inches maximum above the finished which includes the required 30 inches of clear dining surface so that the surface does not prohibit disabled individuals from being equally afforded the opportunity to sit and enjoy the goods and services at the establishment;

**E.** Defendant provides a toilet room for able-bodied individuals, but fails to afford individuals with disabilities the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendant:

**(1)** When entering and/or exiting the restroom there is insufficient maneuvering clear floor space for individuals who require mobility devices to approach the door to pull it open and/or maneuver into the toilet room because the concrete wall projects 12 inches beyond the face of the door measured perpendicular to the face of the door;

**(2)** Defendant maintains a number of items in the maneuvering clearance at the toilet room door which has the discriminatory effect in practice of

prohibiting individuals with disabilities from the full and equal opportunity to maneuver independently throughout the toilet room;

**(3)** The toilet room door swings into the required clear floor space provided at fixtures within the room;

**(4)** The wall mounted trash can projects off the wall into the required maneuvering clearance on the latch side of the door;

**(5)** There is a floor drain that has an opening larger than ½ inch;

**(6)** The toilet room door operating hardware fails to be maintained in conformance with the ADA Standards for Accessible Design so that the hardware does not require tight grasping, twisting, and/or pinching of the wrist;

**(7)** The toilet room fails to be maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by individuals with disabilities which has the discriminatory effects of rendering the water closet and its associated elements as unusable by individuals with disabilities;

**(8)** The clear floor space around the water closet fails to be maintained in conformance with the ADA Standards for Accessible Design so that the lavatory sink and/or other associated obstructions are not restricting the water closets usability by individuals with disabilities;

**(9)** The toilet paper dispenser fails to be properly maintained in conformance with the ADA Standards for Accessible Design so that the dispenser is located 7-9 inches from the front of the water closet;

**(10)** The side wall grab bar fails to conform to the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a 42 inch long grab bar that is located a maximum of 12 inches from the rear wall and extending a maximum distance of 54 inches from the rear wall, with the top gripping surface of the grab 33-36 inches above the finished floor;

**(11)** The rear wall grab bar fails to conform to the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a 36 inch long grab bar installed so that it is located 12 inches on the closed side of the toilet room and 24 inches on the transfer side and mounted so that the top gripping surface measures 33-36 inches above the finished floor;

**(12)** Defendant fails to maintain the accessible features of the restroom that are required to be readily accessible to and usable by individuals with disabilities;

**F.** Defendants provide a lavatory for able-bodied individuals, but fails to afford individuals with disabilities the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to individuals without disabilities, which includes but is not limited to the following failures of Defendants:

**(1)**   The lavatory fails to be maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by individuals with disabilities which has the discriminatory effect of rendering the lavatory sink and its associated elements as unusable by individuals with disabilities;

**(2)**   There is not at least one ADA accessible lavatory that is maintained in a usable condition so that the top surface of the rim on the lavatory sink measures a maximum of 34 inches above the finished floor and positioned for a forward approach;

**(3)**   The clear floor space at the lavatory sink fails to be maintained in conformance with the ADA Standards for Accessible Design so that the knee and toe clearance is not restricting the usability by individuals with disabilities;

**(4)**   The paper towel dispenser fails to be maintained in a usable condition so that the dispenser and its operable parts do not require the use of tight grasping, twisting, and/or pinching of the wrist or otherwise restrict the continuous flow of paper;

**(5)**   The paper towel dispenser fails to be maintained in a usable condition so that the dispenser and its operable parts measure a maximum of 48 inches above the finished floor;

    **(6)**   There is not at least one lavatory with a mirror that is maintained in a usable condition so that the bottom reflecting surface of the mirror measures a maximum of 40 inches above the finished floor;

    **(7)**   There is not at least one lavatory with a soap dispenser that is maintained in a usable condition so that the dispenser measures a maximum of 48 inches above the finished floor;

**23.**    To date, the barriers to access and other violations of the ADA still exist and have not been remedied or altered in such a way as to effectuate compliance with the provisions of the ADA.

**24.**    Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. §12205.

**25.**    Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant Plaintiff's injunctive relief, including an Order to alter the discriminating facility to make it readily accessible to, and usable by, individuals with disabilities to the extent required by the ADA, and closing the facility until the requisite modifications are completed, and to further order the Defendants to modify their policies, practices, and procedures, to provide equal use of its facilities, services and benefits to disabled individuals.

**COUNT TWO**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III**
**42 U.S.C. § 12182(b)(2)(A)(ii)**
*(Practices, procedures, and policies denying equal benefits)*
<u>ADA Title III Prohibits Other Discrimination in Addition to Architectural Barriers</u>

26.     Plaintiff incorporates by reference and re-alleges all of the paragraphs above.

27.     The ADA, Title III, provides a private right of action for "any person who is being subjected to discrimination on the basis of disability in violation of" Title III. 42 U.S.C. § 12182(a)(1) (emphasis added).

28.     The ADA, Title III, specifically makes it unlawful to provide individuals with disabilities with an "unequal benefit," and to relegate individuals with disabilities to a "different or separate" benefit. 42 U.S.C. §§ 12182(b)(1)(A))(ii)-(iii); 28 C.F.R. § 36.202(b)-(c). In other words, individuals with disabilities must receive equal benefits as the nondisabled. Further, 28 C.F.R. § 302(b) requires that goods, services, and accommodations be provided to individuals with disabilities in "the most integrated setting appropriate." 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a). Similarly, the Preamble in addition to recognizing that persons who use wheelchairs and mobility aids have been forced to sit apart from family and friends, also recognizes that persons who use wheelchairs and mobility aids historically have been provided "segregated accommodations" compared to non-disabled individuals, thus relegating persons who use wheelchairs "to the status of second-class citizens." <u>See</u> 28 C.F.R. pt. 36, App. B, at 631-633, 651 (2000) (discussion of §§ 36.308, 36.203).

29.     Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers,

overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. § 12101(a)(5).

30. To address this broad range of discrimination in the context of public accommodations, Congress enacted ADA, Title III, which provides in part: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. 12182.

31. By its clear text, ADA, Title III requires a public accommodation to provide individuals with disabilities *more than simple physical access.* Removal of architectural barriers as required by Count One of this Complaint is but one component of compliance with ADA, Title III. Congress recognized that "individuals with disabilities continually encounter various forms of discrimination" including not only barriers to physical access, but also other forms of exclusion and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities. 42 U.S.C. 12101(a)(5); see also H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").

32. For that reason, the Act applies not only to barriers to physical access to places of public accommodation, but also to any policy, practice, or procedure that operates to deprive or

diminish disabled individuals' full and equal enjoyment of the privileges and services offered by

the public accommodation to the public. 42 U.S.C. § 12182. Thus, a public accommodation may

not have a policy, practice or procedure that excludes individuals with disabilities from services.

42 U.S.C. § 12182(b)(2)(A)(ii). The Eleventh Circuit held in <u>Rendon v. Valleycrest Prod., Ltd.</u>

294 F.3d 1279, (11th Cir. 2002) that:

> *"A reading of the plain and unambiguous statutory language at issue reveals that the definition of discrimination provided in Title III covers both <u>tangible barriers</u> (emphasis added), that is, physical and architectural barriers that would prevent a disabled person from entering an accommodation's facilities and accessing its goods, services and privileges, see 42 U.S.C. § 12182(b)(2)(A)(iv), and <u>intangible barriers</u> (emphasis added), such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the Defendants entity's goods, services and privileges."*

**Defendants' Failed Practices and Lack of Policies Are Discriminatory**

**33.**     Pursuant to 42 U.S.C. § 12182(b)(2)(A)(ii) discrimination includes:

> *"a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."*

**34.**     Accordingly, a place of public accommodation must modify a policy or practice

that has the consequence of, or tends to deny, access to goods or services to people with disabilities.

Similarly, a place of public accommodation must not have a policy or practice that "has a

discriminatory effect in practice" of preventing disabled individuals from realizing the full and equal enjoyment of the goods and services the public accommodation offer to potential customers. *Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F.Supp.3d 565 (D. Vt. 2015).

35.     As detailed below, Defendants have failed to make reasonable modifications in their policies, practices, and procedures that are necessary to afford their goods, services, facilities, privileges, advantages, or accommodations to individuals with restricted mobility. By failing to take such efforts that may be necessary to ensure that no individual with a disability is excluded, Defendants denied services, segregated or otherwise treated Plaintiff differently than other individuals who are not disabled. Pursuant to 42 U.S.C. § 12182(b)(2)(A), Defendants have discriminated against Plaintiff. Defendants will continue that discrimination forever until enjoined as Plaintiff requests. The discrimination is described more particularly in the following paragraphs.

36.     Defendants either have no policies, practices, and procedures to remove architectural barriers or else they do not abide by them. The rampant architectural barriers previously identified in Count One establish that Defendants have failed to create, adopt, and/or implement ADA Title III compliance policies, procedures, and practices as to architectural barriers.

37.     Defendants' use of their establishment, and their practices at the establishment located at 15025 Creosote Rd., Gulfport, MS 39503, literally creates barriers and in so doing denys Plaintiff the full and equal enjoyment of the establishment. Those practices include:

> **A.** Defendants fail to provide ADA accessible parking with connecting accessible routes to the establishment from its parking area, which means that Plaintiff is forced to depend on assistance from a third party to get into

SONIC, whereas non-disabled conveniently access the establishment from the parking area;

**B.** Defendants fail to provide an accessible route to and throughout the establishment that is accessible to individuals with disabilities, which means that Plaintiff cannot travel and move into or throughout the establishment in the way non-disabled people can. Accordingly, he cannot fully and equally use and access SONIC and all of its goods and services as the non-disabled can;

**C.** Defendant's seating arrangements are designed, positioned, and oriented in a way that excludes or otherwise segregates disabled individuals to an experience that is not the same experience that is afforded to able-bodied individuals, because unlike able bodied individuals, individuals with disabilities are forced to sit at one type of table and/or facing the wall, or are outright excluded from the "opportunity" to sit anywhere else that able-bodied individuals are able to sit and enjoy the SONIC dining experience;

**D.** Defendants fail to provide ADA accessible seating tables outside, which means Plaintiff cannot use or dine in SONIC's dining area like non-disabled individuals can;

**E.** Defendants fail to provide a place for patrons with disabilities both to sit and eat like able-bodied people can;

**F.** Defendants make their toilet facilities inaccessible for use by individuals with disabilities by failing to maintain any ADA accessible elements within

the restrooms so that Plaintiff is afforded the opportunity to independently use the restroom, or clean up, or move into and throughout the restroom, whereas non-disabled individuals are able to independently use the restrooms;

**G.** Defendants fail to provide a description of the accessible features of SONIC for individuals with disabilities, which means Plaintiff cannot fully and equally evaluate the features of SONIC in the same way the non-disabled do, because the non-disabled are able to independently use the website to evaluate the features of SONIC;

**H.** Defendants fail to provide a mobile web platform that enables voice recognition software and other assistive touch technologies for individuals with disabilities to receive the same services through the mobile app as non-disabled individuals do;

**I.** Defendants make their "made to order American classics, speedy service from friendly Carhops and heaping helpings of fun and personality" environment inaccessible for individuals with disabilities;

**J.** Defendants' policies, practices, and procedures are conducted without regard to individuals with disabilities;

**38.** As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, Defendants have no policies, practices, or procedures, or else they have failed to implement them, to ensure that any removal of architectural barriers is permanent. 42 U.S.C. § 12182(b)(2)(a)(iv) and (v).

**39.**     As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, Defendants' existing practice is both in effect and/or explicitly to remediate ADA Title III architectural barriers only upon demand by people with disabilities.

**40.**     As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, Defendants have no policies, practices, and procedures or else they failed to create, implement and maintain policies and procedures to ensure individuals with disabilities are able to have the same experience at their facilities as individuals without disabilities, 42 U.S.C. 12182(b)(1)(A), and in particular the opportunity to have full and equal access to all of the goods, services, privileges, advantages, or accommodations of SONIC, as described above in detail.

**41.**     As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, Defendants have failed to create, implement, and maintain a policy of complying with ADA building design standards and regulations.

**42.**     To date, the Defendants' discriminating policies, practices, and/or procedures have not been reasonably modified to afford goods, services, facilities, privileges, advantages, or other accommodations to individuals with disabilities.

**43.**     A reasonable modification in the policies, practices, and procedures described above will not fundamentally alter the nature of such goods, services, facilities, privileges, advantages, and accommodations. The Plaintiff hereby demands that Defendants both create and adopt a corporate practice and policy that Defendants (1) will fully comply with Title III, ADA, and all its implementing regulations so that architectural barriers identified above are permanently removed from Defendants' establishment consistent with the ADA; (2) Defendants will provide individuals with disabilities, including those with mobility limitations full and equal use and

enjoyment of SONIC; (3) SONIC will modify its practice of making ADA Title III architectural barrier remediations only upon demand by individuals with disabilities.

44. Piney Woods Investments, L.L.C., "owns" the real property and improvements located at 15025 Creosote Rd., Gulfport, MS 39503, and is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, as alleged above.

45. McClain Sonics, Inc., "operates" the SONIC quick service restaurant located at 15025 Creosote Rd., Gulfport, MS 39503, and is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, as alleged above.

46. The ADA became effective over twenty-five (25) years ago. Defendants know they must comply with the ADA Title III. The ADA Title III requires modifications in policies, practices, and procedures to comply with it, as pled above in the statute. 42 U.S.C. §12182(b)(2)(A)(ii).

47. Plaintiff, hereby, provides sufficient notice of his demands for an alteration in Defendants' policies, practices, and procedures.

48. Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

49. Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal policies, practices, and procedures.

## COUNT THREE
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### *Denial of Full and Equal Enjoyment*

**50.**     Plaintiff incorporates by reference and re-alleges all of the paragraphs above.

**51.**     42 U.S.C. § 12182(a) provides:

> *"No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."*

**52.**     Congress enacted the ADA upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms for discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

**53.**     Congress also found that: "*individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities,* 42 U.S.C. § 12101(a)(5); "*the nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals;*" 42 U.S.C. § 12101(a)(7). Congress even found that: "*the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs*

*the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity."* 42 U.S.C. § 12101(a)(8).

54.     In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressed discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

55.     The ADA provides, inter alia, that it is discriminatory to subject an individual or class of individuals on the basis of a disability "to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(a)(i).

56.     The ADA further provides that it is discriminatory "to afford an individual or class of individuals, on the basis of a disability ... with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(a)(ii).

57.     Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. 12101(a)(5). Defendants' acts and omissions alleged herein are in violation of the ADA, 42 U.S.C. §§ 12101, et seq., and

the regulations promulgated thereunder.

58.     To address this *broad* range of discrimination in the context of public accommodations, Congress enacted Title III, which by its clear text, requires a public accommodation to provide individuals with disabilities more than simple physical access. Congress recognized that "individuals with disabilities continually encounter *various forms of discrimination"* including not only barriers to physical access, but also other forms of exclusion and *relegation to lesser services, programs, activities, benefits, jobs, or other opportunities*. 42 U.S.C. 12101(a)(5); see also H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").

59.     For that reason, the Act applies not only to barriers to physical access to business locations, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' *full and equal enjoyment* of the privileges and *services* offered by the public accommodation to the public. 42 U.S.C. 12182. Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(1)(A)(i).

60.     The keystone for this analysis is Defendants *must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience.* Spector v.  Norwegian Cruise Line Ltd., 545 U.S. 119, 128–29, 125 S.Ct. 2169, 162 L . E d . 2d 97 (2005) See also, Baughman v.  Walt Disney World Company, 685

F.3D 1131, 1135 (9th Cir. 2012).

61.     Plaintiff was denied full and equal access to SONIC. Plaintiff specifically and definitely wants to return to the Defendant's establishment to enjoy the made-to-order American classics, signature menu items, speedy service from friendly Carhops and heaping helpings of fun and personality experience SONIC offers. More specifically, Plaintiff wants to be afforded the same level of service that is offered to non-disabled individuals and which Defendant has failed to provide to Plaintiff as follows: Defendant failed to provide accessible parking and accessible routes into SONIC for individuals with disabilities, which means Plaintiff cannot park, cannot independently get out of his car and onto his wheelchair, cannot independently travel from the parking area into SONIC, cannot determine if there is a usable parking space, and must determine by trial and error how he is to park and move into SONIC; Defendant failed to provide an accessible route to and throughout the establishment for individuals with disabilities, which means Plaintiff cannot independently travel into and move throughout the establishment; Defendant's failure to provide Plaintiff the same "made-to-order American classics, speedy service from friendly Carhops and heaping helpings of fun and personality" experience by SONIC's use of its outdoor seating arrangements that are designed, positioned and orientated in a way that excludes or otherwise segregates individuals with disabilities to an experience that is not the same experience that is afforded to able-bodied individuals, because unlike able bodied individuals, individuals with disabilities are forced to sit at one type of table or facing the wall, or otherwise outright excluded from the "opportunity" to sit anywhere else that able-bodied individuals are able to sit and enjoy the "made-to-order American classics, speedy service from friendly Carhops and heaping helpings of fun and personality" experience; Defendant failed to provide an accessible

seating area for individuals with disabilities, which means Plaintiff cannot independently use and dine in the SONIC's seating area; Defendant failed to provide an accessible restroom for individuals with disabilities, which means that, unlike the able-bodied, people with disabilities are challenged or denied the opportunity to independently use the restroom, clean up after using the restroom, move throughout the restroom, and prohibited from using all the other elements of the restroom; Defendant's continued failure to maintain ADA accessibility as an integral part of the highest possible dining experience that non-disabled individuals get to independently enjoy has segregated or otherwise treated Plaintiff and others similarly situated differently, in that, SONIC makes Plaintiff dependent on family or an independent third party which is not the same dining experience that SONIC affords to non-disabled individuals and all the foregoing failures by Defendant inhibited Plaintiff from having the same experience that non-disabled individuals have when at SONIC.

62.     In its Preamble to the title III regulation, the Department of Justice recognized that mobility impaired persons including persons in wheelchairs should have the same opportunities to enjoy the goods and services and other similar events of public accommodation with their families and friends, just as other non-disabled individuals do. The DOJ further recognized that providing segregated accommodations and services relegates persons with disabilities to the status of *second-class citizens*. 28 C.F.R. pt. 36, App. B, § 36.203.

63.     The ADA specifically makes it unlawful to provide individuals with disabilities with an "unequal benefit," and to relegate individuals with disabilities to a "different or separate" benefit. 42 U.S.C. §§ 12182(b)(1)(A) )(ii)-(iii); 28 C.F.R. § 36.202(b)-(c). Further, 28 C.F.R. § 302(b) requires that goods, services, and accommodations be provided to individuals with

disabilities in "the most integrated setting appropriate." 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a). Similarly, the Preamble in addition to recognizing that persons who use wheelchairs have been forced to sit apart from family and friends, also recognizes that persons who use wheelchairs historically have been provided "inferior seating" and "segregated accommodations" compared to non-disabled individuals, thus relegating persons who use wheelchairs "to the status of second-class citizens." See 28 C.F.R. pt. 36, App. B, at 631-633, 651 (2000) (discussion of §§ 36.308, 36.203).

64.    Thus, Defendants' "use" of the accessible features constitutes statutory discrimination in violation of the ADA, because Defendants have segregated and separated individuals with disabilities from the non-disabled individuals. "*The goal is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected.*" *H.R. Rep. No. 101-485(III), at 50, 1990 U.S.C.C.A.N at 473.* The ADA provides a "broad mandate" to "eliminate discrimination against disabled individuals, and to integrate those individuals into the economic and social mainstream American life. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675, 121 S.Ct.1879, 149 L.Ed.2d 904 (2001) (*quoting H.R.Rep. No. 101-485, pt. 2, p.50 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 332*).

65.    Defendants discriminated against Plaintiff by denying Plaintiff "full and equal enjoyment" and use of the goods, services, facilities, privileges and accommodations of the facility during each visit. Each incident of deterrence denied Plaintiff an equal "opportunity to participate in or benefit from the goods, services, facility, privilege, advantage, or accommodations" of SONIC.

66.     Defendants' conduct and Defendants' unequal treatment to Plaintiff constitutes continuous violations of the ADA and absent a Court ordered injunction from doing so, Defendants will continue to treat Plaintiff and others similarly situated unequally.

67.     Defendants' failure to maintain the accessible features that are required to be readily accessible to and usable by individuals with disabilities constitutes continuous discrimination and absent a Court ordered injunction, Defendants will continue to not maintain the required accessible features at Defendants' facility. 28 C.F.R.§ 36.211(a).

68.     Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

69.     Pursuant to 42 U.S.C. § 12188, this Court is authorized to enjoin these illegal acts of Defendants.

## COUNT FOUR
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III
### 42 U.S.C. § 12183(a)(1)
*(Failure to design and construct facilities for ADA compliance)*

70.     Plaintiff incorporates by reference and re-alleges all of the paragraphs above.

71.     42 U.S.C. § 12183(a)(1) provides:

> *[Discrimination includes] a failure to design and construct facilities for first occupancy later than 30 months after July 26, 1990, that are readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable to meet the requirements of such subsection in accordance with standards set forth or incorporated by reference in regulations issued under this subchapter.*

72.     Congress passed the ADA in part because "historically, society has tended to isolate and segregate individuals with disabilities, and such forms of discrimination ... continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Congress found that this discrimination included "segregation and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." Id. § 12101(a)(5). In its Preamble to the title III regulation, the Department of Justice recognized that persons in wheelchairs should have the same opportunities to enjoy the goods and services and other similar events of a public accommodation with their families and friends, just as other non-disabled individuals do. The DOJ further recognized that providing segregated accommodations and services relegates persons with disabilities to the status of *second-class citizens*. 28 C.F.R. pt. 36, App. B, § 36.203.

73.     To eliminate such segregation Congress enacted the requirement that facilities be "readily accessible to and usable by individuals with disabilities". This very requirement is intended to enable persons with disabilities "*to get to, enter and use a facility*." H.R. Rep. No. 101-485(III), at 499-500 (1990). It requires "a high degree of convenient accessibility," id., as well as access to the same  services that  are provided to members of the general public. "For new construction and alterations, the purpose is *to ensure that the service offered to persons with disabilities is equal to the service offered to others*." *Id*.

74.     As the legislative history makes clear, the ADA is geared to the future-- the goal being that, over time, access will be the rule rather than the exception. Thus, the ADA only requires modest expenditures to provide access in existing facilities, *while requiring all new construction to be accessible*. H.R. Rep. 485, Part 3, 101st Cong., 2d Sess. 63 (1990).

75.     To realize its goal of a fully accessible future, Congress required that all newly constructed facilities be designed and constructed according to architectural standards set by the Attorney General. 42 U.S.C. §§ 12183(a), 12186(b). Those Standards for Accessible Design ("Standards") are incorporated into the Department of Justice's regulation implementing title III of the ADA, 28 C.F.R. Part 36, Appendix A. The Standards set architectural requirements for newly constructed buildings that apply to all areas of the facility, from parking areas, interior walkways and entrances, common areas, interior stairways and elevators, restrooms, dressing rooms and sales/service areas.

76.     Defendant, Piney Woods Investments, L.L.C., "owns" and "leases to" McClain Sonics, Inc., the real property and its improvements located at 15025 Creosote Rd, Gulfport, MS 39503, and is directly involved in the designing and/or construction of its establishment in this litigation for first occupancy after January 1993.

77.     Defendant, McClain Sonics, Inc., "operates" and "leases from" Piney Woods Investments, L.L.C., the SONIC quick service restaurant located at 15025 Creosote Rd, Gulfport, MS 39503, and is directly involved in the designing and/or construction of its establishment in this litigation for first occupancy after January 1993.

78.     Defendants were and are required to design and construct the SONIC establishment to be "readily accessible to and usable by individuals with disabilities." Defendants violated the statute by failing to design and construct *their establishments to be* readily accessible to and usable by individuals with disabilities including individuals who use wheelchairs. Defendants further violated the statute by failing to design and construct their establishment in compliance with the ADA during planned alterations as described throughout this Complaint.

79.     According to Defendants' own publicly available information, Defendants chose to design their establishment in a way that is not ADA Title III compliant whatsoever. In an attempt to avoid making their services and associated features accessible to individuals with disabilities until demanded by those with disabilities to make the repairs, Defendants literally strategically design each one of its establishments without any regard to ADA Accessibility. Defendants' systematic design of their establishment and their failure to maintain accessibile features of the establishment fails to afford disabled individuals the same quick service dining experience that is afforded to individuals without disabilities.

80.     To date, the Defendants' discriminating actions continue.

81.     Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

82.     Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by Defendants.

## COUNT FIVE
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. § 12182(a)
### *(Failure to Integrate Website Accessibility)*

83.     Plaintiff incorporates by reference and re-alleges all the paragraphs above.

84.     The ADA's legislative history provides that integration is fundamental to the purposes of the ADA. Provision of segregated accommodations, goods and services relegate persons with disabilities to be an inferior second-class citizen. *H. Rep. 101–485(III), 101st Cong., *1279 2d Sess., at 56, reprinted in 1990 U.S.C.C.A.N. 445, 479.* "*The goal is to eradicate the*

*invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected." Id. at 50, 1990 U.S.C.C.A.N. at 473.*

85.     Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. 12101(a)(5).

86.     Legislative history indicates that websites of public accommodations are covered by Title III. Although the internet did not exist when Congress enacted the ADA in 1990, the legislative histories state that Congress intended to include the use of new and evolving technologies by public accommodations and other covered entities in meeting their ADA obligations.  Consequently, it is consistent with Congressional intent to include within Title III's coverage the goods and services provided by public accommodations through their websites.  *See Nat'l Fed'n of the Blind v. Scribd*, 97 F.Supp. 3d 565, 574 (D. Vt. 2015).

87.     The Justice Department has long affirmed the application of Title III to the websites of public accommodations. *The statute's broad and expansive nondiscrimination mandate reaches goods and services provided by covered entities on Web sites over the Internet."* 75 Fed Reg. 43,460, 46,463 See also *Netflix*, 869 F. Supp. 2d at 200 *(excluding web-based services would "run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges, and advantages available indiscriminately to other members of the general public." Carparts Distribution Center, Inc. v.*

*Automotive Wholesaler's Association of New England, Inc.,* 37 F.3d 12, 20 (1st Cir. 1994).

88.     Today, internet technology enables individuals to participate actively in their community and engage in virtually all forms of commerce from the comfort and convenience of their home, to the extent that virtual reality through the internet is almost as important as physical reality in brick-and-mortar constructed public accommodations, in pursuing commerce from public accommodations. That websites were not explicitly written into the ADA at its passage in the early 1990s but are nevertheless covered does not indicate ambiguity in the ADA, but rather the breadth of the ADA. *Andrews v. Blick Art Materials, LLC*, No. 17-CV-767, 2017 WL 3278898, (E.D.N.Y. Aug. 1, 2017).

89.     The design of Defendants' website does not allow Plaintiff to use the website in the same manner as individuals without disabilities, because the website fails to integrate alternative platforms that enable individuals with disabilities who have limited use of their hands the opportunity to use the alternative platforms to navigate and select items on the page. The able-bodied online website user can use a mouse to navigate, whereas individuals who have limited use of their hands cannot use a mouse and must instead rely on assistive technology and accessible website design to navigate through the website. Moreover, Defendants provides a plethora of services and associated benefits, including but not limited to: SONIC restaurant locators, deals, MySONIC account access and benefits, among other services to able-bodied individuals, but fails to provide those same services to individuals with disabilities which relegates and otherwise segregates them to inferior benefits and services of SONIC.

90.     The design of Defendants' web site impedes Plaintiff and others similarly situated

from accessing the services, privileges and accommodations afforded able-bodied patrons through the web platform. The website fails to integrate alternative access methods that allow a person with limited manual dexterity to access the information and navigate the web site without being able to use a mouse. That is, the website design does not provide for functions to be carried out using a keyboard or voice input. On its website, Defendants provides a plethora of services and associated benefits, including but not limited to: SONIC restaurant locators, deals, MySONIC account access and benefits, among other services to the general public, but fails to provide those same services to persons with disabilities. Such actions relegate and otherwise segregate persons with disabilities to inferior benefits and services offered by SONIC.

91.     Intangible barriers to access are prohibited, just as tangible barriers are prohibited.

92.     The actions by the Defendants violate the following statutory and regulatory provisions of the ADA:

**A.** 42 U.S.C. § 12182(a), because their actions deny Plaintiff full and equal enjoyment of Defendants' goods and services;

**B.** 42 U.S.C. § 12182(b)(1)(A)(i), because Defendants' actions deny Plaintiff equal participation in goods and services offered by the Defendants;

**C.** 42 U.S.C. § 12182(b)(1)(A)(ii) and (iii), because Plaintiff is provided both separate and unequal benefits of Defendants' goods and services;

**D.** 42 U.S.C. § 12182(b)(1)(B), because Defendants do not provide their goods and services in the most integrated setting appropriate;

**E.** 28 C.F.R. 36.303(c), because Defendants have failed to provide auxiliary aids and services where necessary to ensure effective communication with the Plaintiff.

93.     Plaintiff does not allege that there are a particular set of mandatory regulations for websites that establish compliance or non-compliance as a matter of law. Plaintiff pleads, consistent with the Department of Justice determinations, that in achieving such conformance and usability of websites by individuals with disabilities, Defendants should rely upon the User Agent Accessibility Guidelines ("UAGG") 1.0, the Authorizing Tool Accessibility Guidelines ("ATAG") 2.0, and the Guidance on Applying WCAG 2.0 to Non-Web Information and Communications Technologies ("WCAH2ICT"), published by the W3C, as well as guidance published by the W3C's Mobile Accessibility Task Force, as stated guidance published by the W3C's Mobile Accessibility Task Force.

94.     To date, the Defendants' discriminating actions continue.

95.     As pled above, SONIC Corp. is the "owner" of the public internet website www.sonicdrivein.com and "operates" the world-wide websites services that are available to the public at SONIC. Defendants, therefore, are responsible for the design and maintenance of the website.

96.     Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

97.     Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by Defendants.

## COUNT SIX
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III

### 42 U.S.C. § 12182(2)(A)(iii)
### *(Failure to Provide Mobile Application Accessibility)*

**98.**     Plaintiff incorporates by reference and re-alleges all the paragraphs above.

**99.**     The ADA was the most sweeping civil rights legislation since the Civil Rights Act of 1964. When it was enacted Congress had no conception of how the Internet would change global commerce. "[W]e were not communicating by e-mail, blog, or tweet; we were not filling virtual shopping carts with clothes, books, music, and food; we weren't banking, renewing our driver's licenses, paying taxes or registering for and taking classes online. Congress could not have foreseen these advances in technology. Despite Congress' great cognitive powers, it could not have foreseen these advances in technology which are now an integral part of our daily lives. Yet Congress understood that the world around us would change and believed that the nondiscrimination mandate contained in the ADA should be broad and flexible enough to keep pace." *Achieving the Promises of the Americans with Disabilities Act in the Digital Age—Current Issues, Challenges and Opportunities: Hearing before the H. Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the House Comm. on the Judiciary,* 111th Cong., 2d Sess. 111–95 (2010).

**100.**     Since the internet plays such a critical role in the personal and commercial lives of Americans, excluding persons with disabilities from access to covered entities that use the internet and mobile applications as a means of reaching the public would defeat the purpose of this important civil rights legislation. In today's society, places of public accommodation are increasingly using mobile applications ("mobile apps") to provide services, benefits and goods more effectively to the public and expand the services the public accommodation has to offer in new ways. These services that are provided by public accommodations through web applications,

mobile applications, and hybrid applications ("mobile platform") also should be provided to individuals with disabilities.

101.    ADA Title III states that discrimination includes "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(iii). Regulations promulgated by DOJ implementing Title III require public accommodations to provide "appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). Auxiliary aids and services include . . . *accessible electronic and information technology*, among other methods.  28 C.F.R. § 36.303(b). Auxiliary aids and services also include acquisition or modification of equipment or devices, and other similar services and actions, which would allow a person with a disability to, not only receive communications from a public accommodation, but would also permit that person to interact with and participate in programs which are often available on a mobile platform only.  28 C.F.R. 36.303(b)(3)-(4).

102.    The plain language of these statutory provisions applies to discrimination in offering the goods and services ''of'' a place of public accommodation or the services, programs, and activities ''of'' a public entity, rather than being limited to those goods and services provided ''at'' or ''in'' a place of public accommodation or facility of a public entity.

103.    Since the enactment of the ADA and its corresponding regulations for Title III,

both the statute and regulations have always required that public accommodations provide effective communication to persons with disabilities through the provision of auxiliary aids and services. A commercial transaction between a customer and a public accommodation requires communication and interaction between the two. Defendants have chosen to provide a service through a mobile application to locate Sonic quick-service restaurants, view the Sonic menu, order ahead, enjoy MySONIC account access and benefits, among many other services through the mobile platform. The Defendants furnish all of these services and features to able-bodied individuals. Yet, Defendants' use of and design of its mobile application and the services it offers through the application do *not* effectively communicate and provide services to individuals with disabilities. This is contrary to the broad mandate of the ADA which prohibits not only outright exclusion but also unnecessary differential treatment. See 42 U.S.C. §§ 12182(a), (b)(1)(A), (b)(2)(A)(iii). Congress expressly stated when passing the ADA, "…*the types of accommodations and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times[,]" and that technological advances "may require public accommodations to provide auxiliary aids and services in the future which today would not be required because they would be held to impose undue burdens on such entities*." *See* H.R. Rep. No. 485, pt. 2, at 108 (1990).

**104.**     The unlawful implementation of eligibility criteria in other contexts that are clearly covered by the Act is analogous to the Defendants' effective screening of Plaintiff from using its mobile app. For example, there is no question that the administration of admission testing by a private secondary school falls within the scope of Title III. See 42 U.S.C.Section 12189; 28 C.F.R. 36.309. There would be little question that the ADA would apply, and would be violated, if

Defendants screened guests as they entered, sending home guests on the grounds that they had disabilities such as deafness, or physical impairments or had diabetes or any other disability. See 28 C.F.R. Pt. 36 App. B, p. 640 (commentary to 28 C.F.R. 36.301) ("*It would violate this section to establish exclusive or segregative eligibility criteria that would bar, for example, all persons who are deaf from playing on a golf course or all individuals with cerebral palsy from attending a movie theater.*"). ("*An insurance company can no more refuse to sell a policy to a disabled person over the Internet than a furniture store can refuse to sell furniture to a disabled person who enters the store'. Accordingly, the site of the sale is irrelevant. All that matters is whether the good or service is offered to the public.* (Nat'l Fed'n of the Blind. Scribd Inc.*, 97 F. Supp. 3d 565 (D. Vt. 2015). The Defendants' failure to design its mobile platform in order to permit access by persons using assistive technology in relation to its mobile app directly and physically screens and prevents the Plaintiff from being able to use the mobile app, just as if Defendants in their restaurant placed items outside the Plaintiff's reach or placed a flight of stairs at the front door without a ramp.

     **105.**    In our contemporary technological society, "excluding businesses that sell services through the Internet from the ADA would 'run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges, and advantages available indiscriminately to other members of the general public." Netflix*, 869 F.Supp.2d at 200 (quoting Carparts, 37 F.3d at 20). (quoting Nat'l Fed'n of the Blind. Scribd Inc.*, 97 F. Supp. 3d 565 (D. Vt. 2015).

     **106.**    Defendants' actions diminish Plaintiff's rights under the ADA to fully participate in all aspects of society, which is counter to Congress' goal. Defendants' actions, as described

throughout the Complaint, are excluding Plaintiff from equality of opportunity, full participation, independent living, and economic self-sufficiency and in doing so excludes Plaintiff from a host of goods and services that are offered through the mobile platform which includes but is not limited to the following:

> **A.** Defendant is excluding, denying services, and otherwise segregating Plaintiff from all of the benefits and services Defendant offers through its mobile apps as a result of its failure to modify its mobile application platform to allow assistive technology, which includes, but is not limited to, voice recognition, alternative input methods, assistive touch functions, among other accessibility methods that Plaintiff requires, to compete on an equal basis and maintain independence and  self-sufficiency;

> **B.** Defendant is excluding, denying services, or otherwise segregating Plaintiff, because unlike able bodied individuals, individuals with disabilities are excluded from Defendant's services that enable individuals to locate the nearest SONIC quick-service restaurant through the mobile apps;

> **C.** Defendant is excluding, denying services, or otherwise segregating Plaintiff, because unlike able bodied individuals, individuals with disabilities are excluded from Defendant's services that enable individuals to register their emails or Facebook accounts for a MySONIC account to receive rewards and other exclusive benefits through the mobile apps;

> **D.** Defendant is excluding, denying services, or otherwise segregating

Plaintiff, because unlike able bodied individuals, individuals with disabilities are excluded from Defendant's services that enable individuals to establish a MySONIC account and enjoy the benefits which include but are not limited to (1) order ahead at select drive-ins, (2) exclusive rewards and offers, and (3) quick mobile payment options, through the use of the mobile apps;

E.  Defendant is excluding, denying services, or otherwise segregating Plaintiff, because unlike able bodied individuals, individuals with disabilities are excluded from Defendant's services that enable individuals to access and view all of the benefits of SONIC as well as to receive the benefits of the MySONIC rewards account through the use of the mobile apps;

F.  Defendant is excluding, denying services, or otherwise segregating Plaintiff, because unlike able bodied individuals, individuals with disabilities are excluded from Defendant's services that enable individuals to view the SONIC menu through the mobile apps;

G.  Defendant is excluding, denying services, or otherwise segregating Plaintiff, because unlike able bodied individuals, individuals with disabilities are excluded from Defendant's services that enable individuals to order ahead through the mobile apps and skip the line;

H.  Defendant is excluding, denying services, and otherwise segregating Plaintiff as a result of its failure to modify equipment, devices and/or other

similar services. 28 *C.F.R.* § 36.303(b)(3)-(4).

I.   Defendant is excluding, denying services, or otherwise segregating Plaintiff of all the goods and services offered on its mobile apps as a result of Defendant's failure to design its mobile apps which would allow access by patrons using alternative assistive technology;

107.   The design of Defendants' mobile app impedes Plaintiff and others similarly situated from accessing the services, privileges and accommodations afforded patrons through the mobile app. The mobile app fails to integrate alternative access methods that allow a person with limited manual dexterity in their hands to access the information and navigate the mobile app.

108.   The actions by the Defendants violate the following statutory and regulatory provisions of the ADA:

A.   42 U.S.C. § 12182(a), because their actions deny Plaintiff full and equal enjoyment of Defendants' goods and services;

B.   42 U.S.C. § 12182(b)(1)(A)(i), because Defendants' actions deny Plaintiff equal participation in goods and services offered by the Defendants;

C.   42 U.S.C. § 12182(b)(1)(A)(ii) and (iii), because Plaintiff is provided both separate and unequal benefits of Defendants' goods and services;

D.   42 U.S.C. § 12182(b)(1)(B), because Defendants do not provide their goods and services in the most integrated setting appropriate;

E.   28 C.F.R. 36.303(c), because Defendants have failed to provide auxiliary aids and services where necessary to ensure effective communication with the Plaintiff with a disability.

109.   Plaintiff does not allege that there are a particular set of mandatory regulations for mobile applications that establish compliance or non-compliance as a matter of law. Plaintiff pleads, consistent with the Department of Justice determinations, that in achieving such conformance and usability of mobile apps by individuals with disabilities, Defendants should rely upon the User Agent Accessibility Guidelines ("UAGG") 1.0, the Authorizing Tool Accessibility Guidelines ("ATAG") 2.0, and the Guidance on Applying WCAG 2.0 to Non-Web Information and Communications Technologies ("WCAH2ICT"), published by the W3C, as well as guidance published by the W3C's Mobile Accessibility Task Force, as stated guidance published by the W3C's Mobile Accessibility Task Force.

110.   To date, the Defendants' discriminating actions continue.

111.   As pled above SONIC Corp., "owns" the SONIC mobile application and its goods and services offered on the mobile app, and is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, as alleged above.

112.   Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

113.   Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by Defendants.


   **WHEREFORE**, premises considered, Plaintiff demands judgment against the Defendants on Counts One through Five and requests the following injunctive and declaratory

relief:

1. That the Court declare that the property owned and business operated by the Defendants as well as all Defendants' illegal actions described herein violate the Americans with Disabilities Act, as more particularly described above;

2. That the Court enter an order enjoining the Defendants to alter the facility to make it accessible to and usable by individuals with disabilities to the full extent required by Title III of the ADA, to comply with 42 U.S.C. § 12182(b)(2)(A)(iv) and its implementing regulations, as stated in Count One;

3. That the Court enter an order, in accordance with Count Two, directing the Defendants to modify their policies, practices, and procedures both to remedy the numerous ADA violations outlined above, in violation of 42 U.S.C. § 12182(b)(2)(A)(ii), and to permanently enjoin Defendants to make their business practices consistent with ADA Title III in the future;

4. That the Court enter an order directing the Defendants to provide Plaintiff full and equal access both to the SONIC experience and to the use of the establishment, and further order Defendants to maintain the required accessible features at the establishment so that Plaintiff and others similarly situated are offered the experience that is offered to non-disabled individuals, as stated in Count Three;

5. That the Court enter an Order directing the Defendants to evaluate and neutralize their policies, practices, and procedures towards persons with disabilities for such reasonable time so as to allow them to undertake and complete corrective procedures;

6. That the Court declare that the website and mobile applications operated by the Defendant herein violates the Americans with Disabilities Act, as more particularly

described above;

7.  That the Court enter an order directing the Defendant to provide Plaintiff full and equal access both to the SONIC experience and to the use of the website and mobile applications, and further order Defendant to maintain the required accessible features of the website and mobile applications so that Plaintiff and others similarly situated are offered the same experience that is offered to members of the general public without disabilities, as stated in Count Four and Count Five. 42 U.S.C. § 12182(a);

8.  That the Court enter an order requiring that Defendants adopt and implement a website accessibility policy and take the necessary actions to make their website accessible to the Plaintiff, as particularly described in Count Four;

9.  That the Court enter an order requiring Defendants to place on their homepage a statement concerning its website accessibility policy; provide training to all their employees and associates who write or develop programs or code; and test their website quarterly to identify and repair any incidence of nonconformance;

10. That the Court enter an order requiring Defendants to adopt and implement a mobile application accessibility policy and take the necessary actions to make their mobile application accessible to the Plaintiff, as particularly described in Count Five;

11. That the Court enter an order requiring Defendants to place on their mobile application a statement covering their mobile application accessibility policy; provide training to all their employees and associates who write or develop the programs and code for the mobile application; and test the mobile application quarterly to identify and repair any incidents of non-conformance;

12. That the Court award reasonable attorney's fees, costs, (including expert fees) and

other expenses of suit, to Plaintiff; and

13.     That the Court award such other, further, and different relief as it deems necessary,

just, and proper.


Respectfully Submitted, this the 15th Day of August, 2018.


/s/ _____
**Pshon Barrett**
MS- 2071
ADA Group LLC
4001 Carmichael Road, Suite 570
Montgomery, Alabama 36106
334.819.4030 p
334.521.3859 f
Pshon.Barrett@ADA-Firm.com
*Attorney for the Plaintiff*


/s/ _____
**Bradley D. McAdory**
MS BPR # 10545
ADA Group LLC
4001 Carmichael Road, Suite 570
Montgomery, Alabama 36106
334.819.4030 p
334.521.3859 f
BDM@ADA-Firm.com
*Attorney for the Plaintiff*

## CERTIFICATE OF SERVICE

This is to certify that I have this day filed with the Clerk of Court the aforementioned

Complaint for service of process by USPS mail or electronic mail, postage prepaid and properly

addressed this 15 day of August, 2018 to the following:

**PINEY WOODS INVESTMENTS, L.L.C.**
Attn.: Registered Agent
299 Stallings Bridge Road
Tylertown, MS 39667

**MCCLAIN SONICS, INC.**
Attn.: Registered Agent
425 Christine Drive
Ridgeland, MS 39158

**SONIC Corp.**
Attn.: Legal Department
300 Johnny Bench Drive
Oklahoma City, OK 73104

/s/

**Pshon Barrett**
MS- 2071
ADA Group LLC
4001 Carmichael Road, Suite 570
Montgomery, Alabama 36106
334.819.4030 p
334.521.3859 f
Pshon.Barrett@ADA-Firm.com
*Attorney for the Plaintiff*